## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,
     Plaintiff,

        v.

LARCHMONT PHARMACY, LLC,
   KIMBERLY HUYNH, and
   $385,000.00 IN UNITED STATES
   CURRENCY,

      Defendants.

Civil Action No.

Jury Trial Demanded

## COMPLAINT

The United States brings this civil suit to hold Larchmont Pharmacy and its pharmacist, Kimberly Huynh, accountable for their involvement in illegally dispensing tens of thousands of controlled substance pills for cash from a drug trafficking organization in Philadelphia. The Controlled Substances Act makes pharmacies and pharmacists responsible for ensuring that controlled substances are only dispensed when presented with an effective, valid prescription issued for a legitimate medical purpose in the usual course of professional practice. Larchmont Pharmacy, a 13-mile drive from Philadelphia, obtained its registration with the Drug Enforcement Administration to dispense controlled substances in January 2016. Shortly thereafter, in September 2016, Larchmont and pharmacist Kimberly Huynh began their participation in a years-long scheme to dispense thousands of controlled substance pills, particularly oxycodone, to individuals who drove in from Philadelphia with forged prescriptions and cash. By the time the DEA identified the forgery ring and Larchmont's role, Larchmont and Huynh had participated for almost two years and dispensed tens of thousands of controlled substance pills, and executed the scheme with prescriptions that were obviously forged. In the midst of criminal charges, the United States brings this civil suit to pursue the substantial civil penalty and forfeiture exposure arising from this scheme of cash for pills.

## PARTIES

1.      Plaintiff is the United States of America.

2.      Defendant Larchmont Pharmacy, LLC is a New Jersey limited liability company. Larchmont is owned by Vu Huynh, Kimberly Huynh's husband. The Drug Enforcement Administration (DEA) granted Larchmont a registration on January 12, 2016, as a retail pharmacy authorized to purchase and dispense Schedule II-V controlled substances at 200 Larchmont Boulevard #5, Mount Laurel, New Jersey. Defendant Kimberly Huynh was registered with the New Jersey pharmacy board as Larchmont Pharmacy's pharmacist-in-charge. Larchmont Pharmacy, LLC surrendered its DEA registration effective December 20, 2019 and sold many of its assets to another retail pharmacy after learning of the United States' investigation.

3.      Larchmont Pharmacy has purposely availed itself of the benefits and protections of the Commonwealth of Pennsylvania by establishing minimum contacts with the Commonwealth, including the Eastern District of Pennsylvania, particularly with respect to the conduct outlined below, and knew or reasonably should have known that its activities in and impacting the Commonwealth of Pennsylvania made it foreseeable that it would be brought into Court. Larchmont Pharmacy has sufficient contacts for purposes of personal jurisdiction and is also "found" within the Eastern District of Pennsylvania.[1]  For example:

        a)      Larchmont served the customers from Philadelphia detailed below and illegally dispensed controlled substances, through its agent and pharmacist-in-charge Kimberly

_____

[1] "A defendant is 'found,' for purposes of [28 U.S.C. § 1395(a)] wherever the defendant is subject to personal jurisdiction."  Wright & Miller, *Particular Classes of Cases—Fines, Penalties, Seizures, and Forfeitures*, 14D Fed. Prac. & Proc. Juris. § 3820 (4th ed.).

Huynh, to the drug trafficking organization (DTO) that its agent knew would transport those illegally dispensed controlled substances to Philadelphia.

         b)      Larchmont registered with the Pennsylvania prescription drug monitoring program in October 2016 and reported these illegal transactions to it.

         c)      The controlled substances illegally dispensed were subsequently distributed within the Eastern District of Pennsylvania for illegal purposes by the DTO and therefore had an impact on the District, as outlined below.[2]

         d)      Larchmont's agent and pharmacist-in-charge, Kimberly Huynh, is also licensed as a pharmacist in Pennsylvania.[3]

        4.      Defendant Kimberly Huynh is a citizen of the Commonwealth of New Jersey and resides in Mount Laurel, New Jersey. Huynh is a pharmacist who was and is licensed in Pennsylvania and New Jersey. Huynh was employed as the pharmacist-in-charge and dispensed Schedule II-V controlled substances at Larchmont Pharmacy, LLC. Kimberly Huynh also identified herself as the pharmacist-manager at Larchmont Pharmacy.

        5.      Kimberly Huynh has purposely availed herself of the benefits and protections of the Commonwealth of Pennsylvania by establishing minimum contacts with the Commonwealth, including the Eastern District of Pennsylvania, particularly with respect to the conduct outlined below, and knew or reasonably should have known that her activities in and impacting the Commonwealth of Pennsylvania made it foreseeable that she would be brought into Court.

---

  [2] 42 Pa. Cons. Stat. Ann. § 5322(a)(2) (authorizing personal jurisdiction over a person who "[c]ontract[s] to supply services or things in this Commonwealth").

  [3] *Id*. § 5322(a)(9) (authorizing personal jurisdiction over a person who "[m]ak[es] application to any government unit for any certificate, license, permit, registration or similar instrument or authorization").

Kimberly Huynh has sufficient contacts for purposes of personal jurisdiction and is also "found" within the Eastern District of Pennsylvania. For example:

a)       Kimberly Huynh served the customers from Philadelphia detailed below and illegally dispensed controlled substances to the DTO that she knew would transport those illegally dispensed controlled substances to Philadelphia.

b)       Kimberly Huynh registered with the Pennsylvania prescription drug monitoring program in August 2016 and, through Larchmont Pharmacy, reported these illegal transactions to it.

c)       Kimberly Huynh dispensed all of the illegal controlled substances outlined below, and the controlled substances illegally dispensed were subsequently distributed within the Eastern District of Pennsylvania for illegal purposes by the DTO and therefore had an impact on the District, as outlined below.[4]

d)       Kimberly Huynh took the actions outlined below, which had an impact on the Eastern District of Pennsylvania.[5]

e)       Kimberly Huynh was and is licensed as a pharmacist in Pennsylvania.[6]

6.       Defendant $385,000.00 in United States Currency is a substitute res for the following real property: ███████████, Mount Laurel, New Jersey, which is jointly owned by defendant Kimberly Huynh and Vu Huynh. Under the terms of the Stipulated Order and Consent

---

[4] *Id*. § 5322(a)(2) (authorizing personal jurisdiction over a person who "[c]ontract[s] to supply services or things in this Commonwealth").

[5] *Id*. § 5322(a)(4) (authorizing personal jurisdiction over a person who "[c]aus[es] harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth").

[6] *Id*. § 5322(a)(9) (authorizing personal jurisdiction over a person who "[m]ak[es] application to any government unit for any certificate, license, permit, registration or similar instrument or authorization").

Judgment, defendant Kimberly Huynh has agreed that the defendant $385,000 is subject to forfeiture and that the defendant $385,000 shall be forfeited as a substitute res for █████████ ████ Mount Laurel, New Jersey. The defendant $385,000 is in the custody of the United States Marshals Service, where it shall remain subject to this Court's jurisdiction during the pendency of this action.

7.      Defendants Larchmont Pharmacy, Kimberly Huynh, and $385,000 are collectively referred to as the "defendants."

8.      Vu Huynh is the spouse of defendant Kimberly Huynh, part owner of █████████ ████ Mount Laurel, New Jersey, and owner of defendant Larchmont Pharmacy LLC.

## JURISDICTION AND VENUE

9.      This action is brought by the United States for civil penalties and injunctive relief under the Controlled Substances Act, 21 U.S.C. §§ 801-971.

10.      This Court has subject matter jurisdiction over the Controlled Substances Act civil penalties, 21 U.S.C. § 842, pursuant to 21 U.S.C. § 842(c)(1)(A), and 28 U.S.C. §§ 1331, 1345, 1355.

11.      This Court has subject matter jurisdiction over Controlled Substances Act injunctive relief, 21 U.S.C. §§ 843(f), 882, pursuant to 21 U.S.C. §§ 843(f), 882, and 28 U.S.C. §§ 1331, 1345.

12.      This Court has subject matter jurisdiction over the forfeiture counts pursuant to 28 U.S.C. §§ 1345 and 1355(a).

13.      This Court has personal jurisdiction over Larchmont Pharmacy LLC for all of the reasons outlined in paragraph 3 above, since, *inter alia*, it serviced customers from Philadelphia and provided illegal controlled substances to those customers for several years, since it provided the customers with illegal controlled substances that it knew would be transported back to

Philadelphia, since it reported those transactions to the Pennsylvania prescription drug monitoring program, since it knew the illegally distributed controlled substances would have an impact on Philadelphia, and since its pharmacist was and is licensed in Pennsylvania.

14.     This Court has personal jurisdiction over Kimberly Huynh for all of the reasons outlined in paragraph 5 above, since, *inter alia*, she serviced customers from Philadelphia and provided illegal controlled substances to those customers for several years, since she provided the customers with illegal controlled substances that she knew would be transported back to Philadelphia, since she reported those transactions to the Pennsylvania prescription drug monitoring program, since she knew the illegally distributed controlled substances would have an impact on Philadelphia, and since she was and is still licensed in Pennsylvania.

15.     This Court has in rem jurisdiction over the defendant $385,000 under 28 U.S.C. § 1355(b). Upon filing of this Complaint, the United States requests that the Court issue an arrest warrant in rem pursuant to Supplemental Rule G(3)(b), which the United States will execute upon the defendant $385,000 pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

16.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §§ 1391, 1395, and 21 U.S.C. § 843(f), because the defendants are found in this District,[7] a substantial part of the events or omissions alleged below giving rise to the United States' claims occurred in this District, because the defendants are subject to personal jurisdiction in this District, and because the defendants were "doing business" in the District. Venue is also proper in this

---

[7] "A defendant is 'found,' for purposes of [28 U.S.C. § 1395(a)] wherever the defendant is subject to personal jurisdiction." Wright & Miller, *Particular Classes of Cases—Fines, Penalties, Seizures, and Forfeitures*, 14D Fed. Prac. & Proc. Juris. § 3820 (4th ed.).

District for the forfeiture proceedings pursuant to 28 U.S.C. § 1355(b)(l) and (2) and 28 U.S.C. § 1395(b) and (c), because a civil proceeding for forfeiture of property may be prosecuted in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred and/or any district where such property is found and the such property is brought.

## THE CONTROLLED SUBSTANCES ACT

17.     The Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, and its regulations govern the distribution and dispensing of controlled substances. The CSA establishes strict guidelines "to ensure a sufficient supply for legitimate medical . . . purposes and to deter diversion of controlled substances to illegal purposes. The substances are regulated because of their potential for abuse and likelihood to cause dependence when abused and because of their serious and potentially unsafe nature if not used under proper circumstances." 75 Fed. Reg. 61613 (Oct. 6, 2010).

**I.      Controlled substances are strictly regulated and scheduled based on their potential for abuse and medical uses.**

18.     Federal legislation dictates how prescriptions drugs are categorized. Drugs can be placed in Schedules I through V based on, *inter alia*, their "potential for abuse" and whether they have "a currently accepted medical use in treatment." 21 U.S.C. § 812(b)(2). Schedule II controlled substances are those that have a "high potential for abuse" that "may lead to severe psychological or physical dependence," but have "a currently accepted medical use in treatment." *Id.*

19.     Pursuant to legislation and administrative action by the Drug Enforcement Administration:

a)      oxycodone (including drugs that contain it such as oxycodone-acetaminophen) is an opioid categorized as a Schedule II controlled substance, *see* 21 C.F.R. § 1308.12; and

b)      alprazolam is a benzodiazepine categorized as a Schedule IV controlled substance, *see* 21 C.F.R. § 1308.14.

## II.     Entities that purchase and dispense controlled substances directly to patients, such as retail pharmacies, are required to register with the DEA and subject to strict controls.

20.     The CSA requires those who distribute or dispense controlled substances, including pharmacies which dispense controlled substances pursuant to a prescription, to obtain a registration from the Drug Enforcement Administration.  21 U.S.C. § 822(a).  Individuals or entities who have a registration are commonly referred to as "registrants."

21.     The registration requirements for those who dispense are based on the statute's definition of a "dispenser," which is defined as "a practitioner who [] delivers a controlled substance to an *ultimate user*" "pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance." 21 U.S.C. § 802(10) (emphasis added). That definition includes retail pharmacies which dispense controlled substances directly to patients. *See id.* § 802(21) (defining "practitioner" to include a "pharmacy").

22.     Even when a registrant such as a retail pharmacy falls within the definition of "dispenser" and receives authorization through a DEA registration to dispense controlled substances, it may only dispense a controlled substance as "authorized by their registration and in conformity with the other provisions of" the CSA. *Id.* § 822(b).

8

**III.    Retail pharmacies registered with the DEA are generally permitted to deliver controlled substances only to patients with a valid prescription for a legitimate medical purpose.**

23.    For those entities such as retail pharmacies registered to dispense, the CSA establishes strict limitations on when a controlled substance can be dispensed to the patient and ultimate user. It generally provides that, unless a practitioner dispenses directly or there is an emergency, Schedule II, III, and IV controlled substances can only be dispensed upon a "prescription." 21 U.S.C. § 829(a), (b).

24.    A prescription is effective only if issued for a "legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

25.    In addition, the CSA's implementing regulations provide direction specifically for pharmacists by providing that "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy . . . ." *Id.* § 1306.06.[8]

26.    The CSA's implementing regulations explicitly warn pharmacists of the consequences of dispensing a controlled substance without satisfying these requirements. "[A] corresponding responsibility [for proper dispensing of controlled substances] rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of

---

[8] With respect to the form of the prescription, the CSA's implementing regulations require that a prescription for a controlled substance "be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner." *Id.* § 1306.05(a),

section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." § 1306.04(a); *see also United States v. Rottschaefer*, 178 F. App'x 145, 147 (3d Cir. 2006) ("The CSA's implementing regulations provide that, to be effective, a prescription 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice' . . . .").

## IV.     When pharmacists are presented with "red flags," they cannot dispense the controlled substance unless they have dispelled the suspicion.

27.     With respect to a pharmacist's "corresponding responsibility" to ensure proper dispensing of controlled substances, pharmacists have a legal duty to ensure that prescriptions for controlled substances are legitimate before dispensing the controlled substance. In other words, the fact that a licensed physician actually or ostensibly prescribed a controlled substance does not obligate a pharmacist to fill that prescription. A reasonably prudent pharmacist must be familiar with suspicious activity or "red flags" indicating that the controlled substances prescribed are at risk for abuse or diversion.

28.     Generally, a "red flag" is anything about a controlled substance prescription that would cause the pharmacist to be concerned that the prescription was not issued for a legitimate medical purpose by a registered prescriber in the usual course of professional practice. Some of the red flags for diversion that all pharmacists should be familiar with include the following:

        a)     The patient's address is a significant distance from the prescriber's address and/or the pharmacy's address.

        b)     The prescriptions are for high dosage strengths of the drug and/or for large quantities.

c)      Multiple people, all of whom obtained similar prescriptions from the same physician and/or same clinic, arrive at the pharmacy at approximately the same time to have their prescriptions filled.

d)      Patients are willing to pay large sums of cash (or write checks or use credit cards) for controlled substances, especially when the patients have insurance coverage available for the drugs.

e)      The prescriptions are part of a prescription "cocktail." A prescription "cocktail" is usually a prescription for an opioid, such as oxycodone, combined with a prescription for a benzodiazepine (anti-anxiety drug) such as alprazolam (also known by its brand name, Xanax), and possibly a muscle relaxant, such as carisoprodol (also known by its brand name, Soma). Cocktail combinations are often sought by drug abusers because they produce an intensified "high," but they can be particularly deadly. The combination of an opioid, benzodiazepine, and muscle relaxant is sometimes referred to as a "Trinity" cocktail.

f)      Two or more controlled substance prescriptions are issued together which indicate duplicate therapy, for example, when a patient is issued two or more prescriptions known to treat the same condition in the same manner.

29.     When confronted with one or multiple red flags concerning a prescription for controlled substances, a pharmacist must intervene and resolve the red flags to determine whether or not the prescription is for a legitimate purpose before filling the prescription. The pharmacist must also document his or her findings for future use and reference.

30.     Depending on the type of red flag, there are different steps that the pharmacist can take to determine whether or not the prescription is for a legitimate medical purpose. These steps involve obtaining more information from the physician, the patient, or both. For example,

in situations where a customer from out of town is attempting to fill a controlled substance prescription, a pharmacist should seek information from the patient as to why he or she is in the area trying to fill the prescription at this pharmacy.

31.     When a pharmacist contacts a physician to address red flags presented by the prescription, the standard practice is for the pharmacist to document that contact and the information the pharmacist learns. Documentation noting the red flag and how the pharmacist handled it is required. This ensures that the information is available for other pharmacy staff in the future. Documentation is required even in a pharmacy with only one pharmacist because perfect recall of every encounter with every patient is not realistic. If there is no documentation detailing how the pharmacist addressed the red flag, then it is fair to assume that the red flag was not resolved. For example, if a conversation with the physician about the patient or the drug is not noted on the prescription or in the patient's profile, then it is safe to assume that conversation did not happen.

32.     There are some red flags that a pharmacist cannot resolve by contacting the physician, obtaining a report from the prescription drug monitoring program, or obtaining more information from the patient, such as those cases when the pharmacist has reason to believe that the physician is complicit in abuse or diversion of the controlled substance.

33.     As a general matter, when red flags remain unresolved, a reasonable pharmacist exercising his or her corresponding responsibility should not dispense the controlled substance prescription.

V.     **The DEA has warned pharmacists of this corresponding responsibility to ensure the legitimacy of controlled substance prescriptions prior to dispensing.**

34.    The Drug Enforcement Administration has provided clear public guidance to make pharmacists fully aware of their corresponding responsibility to ensure the legitimacy of controlled substance prescriptions and dispel any suspicion when presented with a red flag.

35.    In 2010, the DEA issued the current version of the *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*. The Pharmacist's Manual was publicly available at: https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/index.html. The Pharmacist's Manual is "a guide to assist pharmacists in their understanding of the Federal Controlled Substances Act and its implementing regulations as they pertain to the pharmacy profession."

36.    After reminding pharmacists of their corresponding responsibility obligations outlined above, the Pharmacist's Manual explains that:

> A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license (see *United States v. Kershman*, 555 F.2d 198 [United States Court Of Appeals, Eighth Circuit, 1977]).

37.    The Pharmacist's Manual also reminds pharmacists of their "responsibility to ensure that a prescription has been issued by an appropriately registered or exempt practitioner."

38.    As for the red flags that obligate a pharmacist to dispel suspicion prior to dispensing, the Pharmacist's Manual identifies examples of "criteria [that] may indicate that a prescription was not issued for a legitimate medical purpose:"

- People who are not regular patrons or residents of the community, show up with prescriptions from the same physician.

- A number of people appear simultaneously, or within a short time, all bearing similar prescriptions from the same physician.

- The patient presents prescriptions written in the names of other people.

- The patient appears to be returning too frequently.  A prescription which should last for a month in legitimate use is being refilled on a biweekly, weekly or even a daily basis.

## VI.    Pharmacies and pharmacists that dispense illegitimate prescriptions expose themselves to substantial civil penalties.

39.    The CSA imposes substantial civil penalties on pharmacies and pharmacists who dispense controlled substances in violation of their corresponding responsibility.

40.    Any person "who is subject to the requirements of [the CSA who] distribute[s] or dispense[s] a controlled substance in violation of [the valid prescription requirement in] section 829 of this title" is subject to a significant civil penalty per violation.  In other words, pharmacies and pharmacists who ignore red flags and fill illegitimate prescriptions violate 21 U.S.C. § 842(a)(1).  *See, e.g.*, *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2017 WL 1405164, at *4 (N.D.W. Va. Apr. 19, 2017), *aff'd sub nom. United States v. Wasanyi*, No. 19-1083, 2020 WL 854824 (4th Cir. Feb. 20, 2020).

41.    Each violation exposes the pharmacy and pharmacist to "a civil penalty of not more than $25,000" for each violation on or before November 2, 2015, and not more than $67,627 for each violation after November 2, 2015.  21 U.S.C. § 842(a)(1), (c)(1)(A); 28 C.F.R. § 85.5.

## FACTS

**I.     Larchmont Pharmacy registered with the DEA in January 2016 to start operating as a retail pharmacy.**

42.     As outlined above, defendant Larchmont Pharmacy, LLC is a New Jersey limited liability company owned by Vu Huynh, Kimberly Huynh's husband. The Drug Enforcement Administration (DEA) granted Larchmont a registration on January 12, 2016, as a retail pharmacy authorized to purchase and dispense Schedule II-V controlled substances at 200 Larchmont Boulevard #5, Mount Laurel, New Jersey.

43.     Defendant Kimberly Huynh is a citizen of the Commonwealth of New Jersey and resides in Mount Laurel, New Jersey. Huynh is a pharmacist who is licensed in Pennsylvania and New Jersey. Huynh was employed as the pharmacist-in-charge and dispensed Schedule II-V controlled substances at Larchmont Pharmacy, LLC. Kimberly Huynh also identified herself as the managing pharmacist for Larchmont Pharmacy.

44.     Kimberly Huynh was the primary pharmacist who operated and managed Larchmont Pharmacy. On March 25, 2016, she notified the New Jersey Board of Pharmacy that she was the pharmacist-in-charge of Larchmont Pharmacy:

 **New Jersey Office of the Attorney General**
Division of Consumer Affairs
Board of Pharmacy
124 Halsey Street, 6th Floor, P.O. Box 45013
Newark, New Jersey 07101   MAR 29 2016 

**Notice of Change of Pharmacist-in-Charge**

Name of Pharmacy **Larchmont Pharmacy**

15

I agree to assume the duties and responsibilities of the Pharmacist-in-Charge at the above pharmacy and am aware of my personal liability for violation of the New Jersey Pharmacy Act.  I am aware of the need to inventory Controlled Dangerous Substances both at the time I assume the position of Pharmacist-in-Charge and when I leave this pharmacy.

_Kimberly A Huynh_      **03/25/2016**

Signature of incoming Registered Pharmacist-in-Charge      Date

45.      Defendant Kimberly Huynh was also the primary pharmacist who dispensed controlled substances at Larchmont.  Kimberly Huynh's initials are listed in Larchmont Pharmacy's internal transaction database as the pharmacist who dispensed all of the illegitimate prescriptions discussed below.

## II.    Shortly after opening, Larchmont and Huynh started dispensing thousands of controlled substances, including oxycodone, to a Philadelphia drug trafficking organization for cash.

46.      After obtaining a DEA registration in January 2016, Larchmont Pharmacy and Kimberly Huynh started dispensing thousands of controlled substances to customers involved in a Philadelphia drug trafficking organization (DTO).[9]

47.      Between September 2016 and November 30, 2018—when the DEA inspected the pharmacy—Larchmont Pharmacy and Kimberly Huynh dispensed thousands of controlled substance pills to participants in the DTO who presented prescriptions that were clearly forged. The DTO participants, all with a residence in Philadelphia, presented the forged prescriptions with purported prescribers who were all from Philadelphia or the Pennsylvania suburbs of Philadelphia.  The prescriptions came in batches, in many cases with identical prescriptions for

---

[9] Several members of the DTO have been criminally charged, and several have pled guilty for their involvement in illegal distribution of the controlled substances obtained from Larchmont and Kimberly Huynh.

different individuals, frequently with typos and mistakes, and often presented by a single member of the DTO but with prescriptions for other individuals. In one case, the single DTO member presented a prescription in the name of a deceased patient. Larchmont Pharmacy and Kimberly Huynh knew or had reason to know the prescriptions were forged, or at best, presented with many "red flags." Rather than scrutinizing the forged prescriptions and their red flags, and rather than complying with the corresponding responsibility, Larchmont and Huynh instead accepted wads of cash from the DTO participants and illegally dispensed the pills.

48.     The pharmacy's Pennsylvania prescriptions significantly increased when they became involved in the scheme:



49.     From September 2016 until the DEA inspected Larchmont Pharmacy and Kimberly Huynh in November 2018, there were countless red flags that defendants flagrantly ignored in order to receive the substantial sums of cash.

50.     The illegal dispensing can be grouped by the Philadelphia and Philadelphia-area prescribers whose controlled substance prescribing privileges were stolen for the scheme. All of

the following prescribers have confirmed to DEA investigators that they did not write these prescriptions; that the prescriptions which Larchmont Pharmacy and Kimberly Huynh repeatedly dispensed are forgeries; and that in many cases the prescribers called to notify Larchmont that they were forgeries. Even with the calls, Larchmont Pharmacy and Kimberly Huynh continued to dispense the controlled substances.

### A.   Forged Prescriptions Purportedly from Philadelphia Prescriber 1

51.   Starting in September 2016, Larchmont Pharmacy and Kimberly Huynh started accepting forged prescriptions for individuals involved in the DTO, all of whom had a residence in Philadelphia, Pennsylvania, which were purportedly written by Philadelphia Prescriber 1.

52.   The forged prescriptions from Philadelphia Prescriber 1 were first dispensed on September 9, 2016. On that day, for the first time, Larchmont Pharmacy and Kimberly Huynh filled five forged prescriptions for two patients:

| Patient | Oxycodone Pills | Alprazolam Pills | Gabapentin Pills[10] |
|---------|-----------------|------------------|----------------------|
| T.B. | 120 for 30mg | 120 for 1mg | 30 for 100mg |
| J.G. | 120 for 30mg | | 30 for 100mg |

Despite this being the first time the Pharmacy was presented with a prescription from Philadelphia Prescriber 1, despite suddenly being presented with five similar prescriptions purportedly from a Philadelphia prescriber and by two patients with a Philadelphia residence, and despite the patients paying for the prescriptions with cash rather than insurance, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding

---

[10] While gabapentin is not a controlled substance and is not the basis of a CSA violation, the United States provides information on the gabapentin as an additional red flag with respect to the oxycodone and alprazolam prescriptions that are the basis of CSA violations.

responsibility by dispensing the controlled substances. Larchmont Pharmacy's internal transaction data reflects they made $1,105.04 in cash for the prescriptions.

53.     This was the beginning of Larchmont Pharmacy and Kimberly Huynh dispensing dozens of these forged prescriptions purportedly written by Philadelphia Prescriber 1, despite significant red flags.

54.     As another example, patients L.D. and K.T., also of Philadelphia, also received controlled substances after presenting forged prescriptions purportedly written by Philadelphia Prescriber 1 on September 16, 2016. Larchmont Pharmacy and Kimberly Huynh filled four prescriptions for those two individuals:

| Patient | Oxycodone Pills | Gabapentin Pills |
|---------|-----------------|------------------|
| L.D. | 120 for 30mg | 50 for 100mg |
| K.T. | 120 for 30mg | 50 for 100mg |

Despite this still being the first month having been presented with a prescription from Philadelphia Prescriber 1, despite this being the first time presented with a prescription from Philadelphia Prescriber 1 for these two individuals, despite suddenly being presented with four identical prescriptions purportedly from the same Philadelphia prescriber by two patients with a Philadelphia residence, and despite the patients paying for the prescriptions with cash rather than insurance, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances. Larchmont Pharmacy's internal transaction data reflects that they made $1,203.68 in cash for the prescriptions.

55.     Patient L.D.'s address in Philadelphia is an example of the distance involved in these prescriptions, which also presented a significant red flag. There are other pharmacies within driving distance of patient L.D.'s home residence, and there are numerous pharmacies between patient L.D.'s address in Philadelphia and Larchmont Pharmacy. With respect to Philadelphia Prescriber 1, identified as the purported prescriber on the forged prescription, a

Google Maps search indicates it would have taken patient L.D. nearly 1.5 hours to drive from his/her residence, to the prescriber's location, to Larchmont Pharmacy, and back home, passing numerous other pharmacies.

56.     Another visit on October 12, 2016 provides another example of Larchmont Pharmacy and Kimberly Huynh dispensing controlled substances by ignoring blatant red flags and violating their corresponding responsibility to ensure a prescription is valid and legitimate. On October 12, 2016, Larchmont Pharmacy and Kimberly Huynh dispensed seven different drugs to five different patients, all purportedly prescribed by Philadelphia Prescriber 1. Looking at only the oxycodone dispensed, Larchmont Pharmacy and Kimberly Huynh dispensed oxycodone for forged prescriptions purportedly written by Philadelphia Prescriber 1 to five different individuals, and four of those prescriptions were identical. Those four prescriptions all had the same date, the same prescriber, the same order number, the same drug, and the same dosage. All of those four prescriptions had improper directions, had a signature that was almost written out, had a typed spelling error, provided a phone number for the purported prescriber that was inconsistent with the prescriber's website, and again involved a remarkable geographic distance based on the individuals' residence (all from Philadelphia), the purported prescriber (also in Philadelphia), and Larchmont Pharmacy (in New Jersey). Again, the drive from one of the individuals' residence, to the prescriber, to Larchmont Pharmacy would have required an approximately 1.5-hour drive roundtrip, passing numerous other pharmacies in the process. As for those October 12, 2016 prescriptions, Larchmont Pharmacy and Kimberly Huynh dispensed drugs based on five forged prescriptions for these five individuals, all purportedly from Philadelphia Prescriber 1:

| Patient | Oxycodone Pills |
|---------|-----------------|
| W.A. | 120 for 30mg |
| C.A. | 120 for 30mg |

| N.D. | 120 for 30mg |
| J.G. | 120 for 30mg |
| E.M. | 120 for 20mg |

Despite this only being the second month having been presented with a prescription from Philadelphia Prescriber 1, and despite suddenly being presented with four identical prescriptions purportedly from a Philadelphia prescriber and by patients with a Philadelphia residence, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing all of these controlled substances at the same time. Larchmont Pharmacy's internal transaction data indicates that they made $2,452.80 for the prescriptions.

57.    In total, between September 9, 2016, and October 25, 2016, Larchmont Pharmacy and Kimberly Huynh dispensed controlled substances in response to 64 different forged prescriptions that were purportedly written by Philadelphia Prescriber 1. Philadelphia Prescriber 1 confirmed to DEA investigators that all of these 64 prescriptions were forged. The following summarizes the forged prescriptions purported to be from Philadelphia Prescriber 1 that Larchmont Pharmacy and Kimberly Huynh illegally dispensed to the Philadelphia DTO:

|  | *Rx* | *Qty* | *$* |
|---|---|---|---|
| Alprazolam | 1 | 120 | $137.81 |
| Oxycodone | 63 | 7,560 | $28,399.30 |
| *Total* | 64 | 7,680 | $28,537.11 |

All of these prescriptions for Philadelphia Prescriber 1 were obviously forged and carried many substantial red flags that caused Larchmont Pharmacy and Kimberly Huynh to know or have reason to know that the prescriptions were illegitimate. Nonetheless, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by illegally dispensing the controlled substances and received approximately $28,537.11 from the DTO for the controlled substances illegally dispensed.

## B.      Forged Prescriptions Purportedly from Philadelphia-Area Prescriber 2

58.      Starting in November 2016, many of the individuals in the Philadelphia DTO who had received controlled substances from Larchmont Pharmacy and Kimberly Huynh based on prescriptions purportedly from Philadelphia Prescriber 1 transitioned over to forged prescriptions purportedly prescribed by Philadelphia-Area Prescriber 2. Larchmont Pharmacy and Kimberly Huynh started accepting those forged prescriptions from the DTO, all of whom had a residence in Philadelphia, Pennsylvania, that were purportedly written by Philadelphia-Area Prescriber 2.

59.      The forged prescriptions from Philadelphia-Area Prescriber 2 were first dispensed on or about November 3, 2016. On that day, for the first time, Larchmont Pharmacy and Kimberly Huynh filled three prescriptions for three patients, the combinations of which are similar to those described above:

| Patient | Oxycodone Pills | Gabapentin Pills |
|---------|-----------------|------------------|
| D.B.    | 120 for 15mg    |                  |
| H.H.    | 120 for 30mg    | 50 for 100mg     |
| L.P.    | 120 for 30mg    | 50 for 100mg     |

Despite this being the first time having been presented with a prescription from Philadelphia-Area Prescriber 2, despite suddenly being presented with very similar prescriptions purportedly from this Philadelphia prescriber and by three patients with a Philadelphia residence all with the same prescriber, and despite all of these patients having previously filled similar prescriptions from Philadelphia Prescriber 1, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances. Larchmont Pharmacy's internal transaction data reflects that they made $1,374.10 for the oxycodone prescriptions.

22

60.     Again, this was the beginning of Larchmont Pharmacy and Kimberly Huynh dispensing over a hundred of these forged prescriptions purportedly written by Philadelphia-Area Prescriber 2, despite significant red flags.

61.     As another example, on January 28, 2017, Larchmont Pharmacy and Kimberly Huynh dispensed 11 different prescriptions for five different individuals in the Philadelphia DTO with forged prescriptions from Philadelphia-Area Prescriber 2. Larchmont Pharmacy and Kimberly Huynh filled the following 11 prescriptions for those five individuals, the combinations of which once again are similar to the ones described above:

| Patient | Oxycodone Pills | Alprazolam Pills | Gabapentin Pills |
|---|---|---|---|
| L.D. | 120 for 30mg | | 50 for 100mg |
| N.D.[11] | 120 for 20mg | | 50 for 100mg |
| O.J. | 120 for 15mg | | 50 for 100mg |
| S.M. | 120 for 30mg | 120 for 1mg | 50 for 100mg |
| I.R. | 120 for 30mg | 120 for 1mg | |

Despite the remarkable similarity between these prescriptions, all from Philadelphia residents from a Philadelphia-Area Prescriber 2, all filled on the same day, despite a paper format that was identical to the forged prescriptions for Philadelphia Prescriber 1, despite four of the five individuals transitioning from Philadelphia Prescriber 1 to Philadelphia-Area Prescriber 2, despite the forged prescriptions listing the same order number for three of the patients on the oxycodone prescriptions, despite the oxycodone prescriptions being almost identical and including improper directions for use, and despite a typed spelling error and an incorrect phone number for the provider on the forged prescriptions, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled

---

[11] Patient N.D. presented with the same last name as patient L.D.

substances. Larchmont Pharmacy's internal transaction data reflects they made $2,477.61 from the controlled substance prescriptions.

62.     Once again, the geographic distance involved in these prescriptions presented a significant red flag. There are many other pharmacies in driving distance of the patients' residence, and there are numerous pharmacies between the patients' residence in Philadelphia and Larchmont Pharmacy. With respect to Philadelphia-Area Prescriber 2, identified as the purported prescriber on these forged prescription, a Google Maps search indicates it would have taken one of the patients nearly 2 hours to drive from their residence, to the prescriber's location, to Larchmont Pharmacy, and back home, passing numerous other pharmacies.

63.     In total, between November 2016 and May 2017, Larchmont Pharmacy and Kimberly Huynh dispensed controlled substances in response to 113 different prescriptions that were purportedly written by Philadelphia-Area Prescriber 2. Philadelphia-Area Prescriber 2 confirmed to DEA investigators that all of these 113 prescriptions were forged and confirmed that no one from Larchmont ever attempted to verify the legitimacy of prescriptions for oxycodone, Xanax, or promethazine-codeine syrup. Philadelphia-Area Prescriber 2 stated that, if Larchmont or Kimberly Huynh would have called, Philadelphia-Area Prescriber 2 would have confirmed that the prescriptions were forged. The following summarizes the forged prescriptions purported to be from Philadelphia-Area Prescriber 2 that Larchmont Pharmacy and Kimberly Huynh illegally dispensed to the Philadelphia DTO:

|  | Rx | Qty | $ |
|---|---|---|---|
| Alprazolam | 31 | 3,720 | $3,570.81 |
| Oxycodone | 90 | 10,800 | $38,216.48 |
| Total | 121 | 14,520 | $41,787.29 |

All of these prescriptions for Philadelphia-Area Prescriber 2 were obviously forged and carried many substantial red flags that caused Larchmont Pharmacy and Kimberly Huynh to know or

have reason to know that the prescriptions were illegitimate.  Nonetheless, Larchmont Pharmacy and Kimberly Huynh illegally dispensed the controlled substances and received approximately $41,787.29 from the DTO for the controlled substances illegally dispensed.

**C.    Forged Prescriptions Purportedly from Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4**

64.    Starting in January 2017, many of the individuals in the Philadelphia DTO whose forged prescriptions listing Philadelphia Prescriber 1 and Philadelphia-Area Prescriber 2 transitioned over to forged prescriptions purportedly prescribed by Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4. Larchmont Pharmacy and Kimberly Huynh started accepting those forged prescriptions from the DTO, all of whom had a residence in Philadelphia, Pennsylvania, that were purportedly written by Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4.

65.    The forged prescriptions from Philadelphia-Area Prescriber 3 were first dispensed on or about January 14, 2017.  On that day, for the first time, Larchmont Pharmacy and Kimberly Huynh filled eleven prescriptions for four patients, the combinations of which are once again similar to those described above:

| Patient | Oxycodone Pills | Alprazolam Pills | Gabapentin Pills |
|---|---|---|---|
| V.B. | 120 for 20mg | 120 for 1mg | 50 for 100mg |
| J.G. | 120 for 20mg | | 50 for 100mg |
| J.G. | 120 for 30mg | 120 for 1mg | 50 for 100mg |
| E.M. | 120 for 30mg | 120 for 1mg | 50 for 100mg |

Despite this being the first time having been presented with a prescription from Philadelphia-Area Prescriber 3, despite suddenly being presented with very similar prescriptions purportedly from this Philadelphia-area prescriber and by four patients with a Philadelphia residence all with the same prescriber, and despite patients having previously filled similar prescriptions from Philadelphia Prescriber 1 and Philadelphia-Area Prescriber 2, Larchmont Pharmacy and

Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances. Larchmont Pharmacy's internal transaction data reflects that they made $2,066.39 for the oxycodone and alprazolam prescriptions.

66.     This was the beginning of Larchmont Pharmacy and Kimberly Huynh dispensing approximately 197 forged prescriptions purportedly written by Philadelphia-Area Prescriber 3 for controlled substances, despite significant red flags.

67.     The same is true with respect to Philadelphia Prescriber 4. The forged prescriptions from Philadelphia Prescriber 4 were first dispensed on or about March 18, 2017. On that day, for the first time, Larchmont Pharmacy and Kimberly Huynh filled ten prescriptions for four patients, the combinations of which are once again similar to those described above:

| Patient | Oxycodone Pills | Alprazolam Pills | Gabapentin Pills |
|---------|-----------------|------------------|------------------|
| J.G.    | 120 for 30mg    | 120 for 1mg      | 50 for 100mg     |
| J.G.    | 120 for 30mg    | 120 for 1mg      | 50 for 100mg     |
| J.M.    | 120 for 20mg    |                  | 50 for 100mg     |
| E.M.    | 120 for 15mg    |                  | 50 for 100mg     |

Despite this being the first time having been presented with a prescription from Philadelphia Prescriber 4, despite suddenly being presented with very similar prescriptions purportedly from a Philadelphia prescriber and by four patients with a Philadelphia residence all with the same prescriber, and despite patients having previously filled similar prescriptions from Philadelphia Prescriber 1 and Philadelphia-Area Prescriber 2, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances. Larchmont Pharmacy's internal transaction data reflects that they made $1,950.76 for the oxycodone and alprazolam prescriptions.

68.     In another example for Philadelphia Prescriber 4, on or about February 6, 2018, Larchmont Pharmacy and Kimberly Huynh dispensed the following controlled substances for patient V.B.:

| Patient | Oxycodone Pills | Gabapentin Pills |
|---------|-----------------|------------------|
| V.B. | 120 for 20mg | 50 for 100mg |

However, patient V.B. was deceased. Despite the many other red flags described above, Larchmont Pharmacy and Kimberly Huynh repeatedly dispensed controlled substances for forged prescriptions written in the name of patient V.B. The dispensing continued through at least November 1, 2018. The following provides an approximate summary of the controlled substances that Larchmont and Kimberly Huynh dispensed for patient V.B. after death:

|  | Rx | Qty | $ |
|--|----|-----|---|
| Alprazolam | 1 | 120 | $115.63 |
| Oxycodone | 10 | 1,200 | $5,175.58 |
| Total | 11 | 1,320 | $5,291.21 |

69.     The red flags and suspicion that was ignored by Larchmont Pharmacy and Kimberly Huynh becomes even more apparent when considering the prescriptions of Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4 together. For example, on November 7, 2018, Larchmont Pharmacy and Kimberly Huynh dispensed seven different prescriptions for five different individuals in the Philadelphia DTO with forged prescriptions from Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4, including oxycodone, oxycodone-acetaminophen, and alprazolam. Despite having no professional affiliation, Larchmont Pharmacy and Kimberly Huynh dispensed these controlled substances after receiving forged prescriptions for Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4 that looked virtually identical. Even more obviously, the prescriptions also had the identical format as those from Philadelphia Prescriber 1 and Philadelphia-Area Prescriber 2, again despite no professional affiliation. Nonetheless, on November 7, 2018, Larchmont Pharmacy and Kimberly Huynh ignored those red flags and others: all of the patients had used multiple prescribers at this point for their forged prescriptions, all of the November 7 prescriptions were for a quantity of 120, all of them had a signature that was almost written out, all had the same improper directions, all had

typed spelling errors, all of them had provider phone numbers that were obviously false based on the providers' websites, and all of them presented the same geographic distance issues. Nonetheless, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances. Larchmont Pharmacy's internal transaction data reflects they made $2,357.79 from the controlled substance prescriptions.

70.     In total, between January 2017 and November 15, 2018, Larchmont Pharmacy and Kimberly Huynh dispensed controlled substances in response to 427 different prescriptions that were purportedly written by Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4. Philadelphia-Area Prescriber 3 confirmed to DEA investigators that all of these prescriptions were forged, told investigators that he called Larchmont to tell them they were fraudulent, and noted that the prescriptions even had fake phone numbers on them. Philadelphia Prescriber 4 contacted both Larchmont and the Philadelphia Police Department to notify them that the prescriptions were fraudulent. The following tables summarizes the forged prescriptions purported to be from Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4 that Larchmont Pharmacy and Kimberly Huynh illegally dispensed to the Philadelphia DTO:

| | Rx | Qty | $ |
|---|---|---|---|
| **Philadelphia-Area Prescriber 3** | | | |
| Alprazolam | 45 | 5,400 | $5,100.08 |
| Oxycodone | 130 | 15,600 | $56,213.94 |
| Oxycodone-Acetaminophen | 22 | 2,640 | $6,875.01 |
| *Total* | 197 | 23,640 | $68,189.03 |
| **Philadelphia Prescriber 4** | | | |
| Alprazolam | 59 | 7,080 | $6,822.17 |
| Oxycodone | 166 | 19,890 | $75,305.72 |
| Oxycodone-Acetaminophen | 5 | 600 | $1,335.31 |
| *Total* | 230 | 27,570 | $83,463.20 |

All of these prescriptions for Philadelphia-Area Prescriber 3 and Philadelphia Prescriber 4 were obviously forged and carried many substantial red flags that caused Larchmont Pharmacy and Kimberly Huynh to know or have reason to know that the prescriptions were illegitimate. Nonetheless, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances and received approximately $151,652.23 from the DTO for the controlled substances illegally dispensed.

D.     **Forged Prescriptions Purportedly from Philadelphia Prescriber 5**

71.     Starting in September 2017, many of the individuals in the Philadelphia DTO whose forged prescriptions listing the above prescribers transitioned over to forged prescriptions purportedly prescribed by Philadelphia Prescriber 5. Larchmont Pharmacy and Kimberly Huynh started accepting those forged prescriptions from the DTO, all of whom had a residence in Philadelphia, Pennsylvania, that were purportedly written by Philadelphia Prescriber 5.

72.     The forged prescriptions from Philadelphia Prescriber 5 were first dispensed on or about September 25, 2017. On that day, for the first time, Larchmont Pharmacy and Kimberly Huynh filled a prescription for one patient, once again identical to the forged prescriptions discussed above: for patient M.W, 120 pills of oxycodone 30mg. Despite this being the first time having been presented with a prescription from Philadelphia Prescriber 5, and despite suddenly being presented with another similar prescription purportedly from a Philadelphia prescriber and by a patient with a Philadelphia residence, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances. Larchmont Pharmacy's internal transaction data reflects that they made $526.85 in cash for the oxycodone prescriptions.

73.     This was the beginning of Larchmont Pharmacy and Kimberly Huynh dispensing controlled substances with over a hundred of these forged prescriptions purportedly written by Philadelphia Prescriber 5, despite significant red flags.

74.     While the prescriptions for Philadelphia Prescriber 5 deviated from the paper format for the previous forged prescriptions, they still contained obvious red flags and signs of forgery. While Philadelphia Prescriber 5 is a nurse practitioner, the prescription was signed as a "MD," even though Larchmont's own labels for the pill bottles acknowledged that Philadelphia Prescriber 5 was a nurse practitioner. And once again, the prescriptions presented the same red flags in terms of consistency of prescriptions and geographic distance.

75.     In total, between September 2017 through November 2018, Larchmont Pharmacy and Kimberly Huynh dispensed controlled substances in response to 103 different prescriptions that were purportedly written by Philadelphia Prescriber 5. Philadelphia Prescriber 5 confirmed to DEA investigators that all of these 103 prescriptions were forged and also confirmed that no one from Larchmont ever attempted to verify the legitimacy of prescriptions. The following tables summarizes the forged prescriptions purported to be from Philadelphia Prescriber 5 that Larchmont Pharmacy and Kimberly Huynh illegally dispensed to the Philadelphia DTO:

|  | *Rx* | *Qty* | *$* |
|---|---|---|---|
| Oxycodone | 103 | 12,360 | $51,382.67 |

All of these prescriptions for Philadelphia Prescriber 5 were obviously forged and carried many substantial red flags that caused Larchmont Pharmacy and Kimberly Huynh to know or have reason to know that the prescriptions were illegitimate. Nonetheless, Larchmont Pharmacy and Kimberly Huynh ignored the red flags and violated their corresponding responsibility by dispensing the controlled substances and received approximately $51,382.67 from the DTO for the controlled substances illegally dispensed.

**E.     The Scope of Larchmont Pharmacy and Kimberly Huynh's Illegal Dispensing Scheme**

76.     In total, Larchmont Pharmacy and Kimberly Huynh illegally dispensed controlled substances at least 715 times by using prescriptions that were obviously forged.

77.     Larchmont Pharmacy and Kimberly Huynh knew or had reason to know of the forged prescriptions in each case, and they ignored the red flags in order to obtain the money from the transactions.

78.     The following table summarizes the illegal dispensing of controlled substances to the Philadelphia DTO for the above prescribers:

|  | *Rx* | *Qty* | *$* |
|---|---|---|---|
| Oxycodone | 552 | 66,210 | $249,518.11 |
| Oxycodone-Acetaminophen | 27 | 3,240 | $8,210.32 |
| Alprazolam | 136 | 16,320 | $15,630.87 |
| *Total* | 715 | 85,770 | $273,359.30 |

79.     All of the prescribers outlined above who purportedly prescribed the controlled substances on these prescriptions confirmed to the DEA investigators that they did not prescribe these controlled substances and that the prescriptions were forged. In many instances, as outlined above, the prescribers informed Larchmont Pharmacy that the prescriptions were fraudulent, but Larchmont Pharmacy and Kimberly Huynh continued to dispense them.

**F.     Tracing of Illegal Proceeds from Larchmont Pharmacy and Kimberly Huynh's Illegal Dispensing Scheme**

80.     As discussed above, Larchmont Pharmacy's internal business data reflects that Larchmont Pharmacy and Kimberly Huynh received $273,359.30 in illegal proceeds from September 2016 through November 2018 from the illegal dispensing of controlled substances to the Philadelphia DTO for the above prescribers.

81.     During the period from September 2016 through November 2018, Larchmont Pharmacy and Kimberly Huynh deposited all of the proceeds obtained by Larchmont Pharmacy, including the illegally obtained proceeds from the illegal dispensing of controlled substances to the Philadelphia DTO for the above prescribers, into TD Bank Account xxx1854, which is held in the name of Larchmont Pharmacy LLC. During this time period, Larchmont Pharmacy and Kimberly Huynh made approximately $1.3 million in deposits into TD Bank Account xxx1854. Those deposits commingled presumptively legitimate electronic business receipts with physical receipts, such as cash.

82.     During the period from September 2016 through November 2018, Larchmont Pharmacy and Kimberly Huynh then engaged in financial transactions with these hidden illegal proceeds by transferring the illegal proceeds commingled with other funds to and between other accounts, further to conceal the source, nature, and location of the illegal proceeds.

83.     Specifically, during the period from September 2016 through November 2018, Larchmont Pharmacy and Kimberly Huynh transferred the illegal proceeds commingled with other funds from TD Bank Account xxx1854 to TD Bank Accounts xxx1862 and xxx1870, which are both held in the name of Larchmont Pharmacy LLC. Larchmont Pharmacy and Kimberly Huynh then further transferred the illegal proceeds commingled with other funds from TD Bank Account xxx1870 to TD Bank Account xxx1862.

84.     During the period from September 2016 through November 2018, Larchmont Pharmacy and Kimberly Huynh engaged in further financial transactions with the hidden and commingled illegal proceeds by then transferring the illegal proceeds commingled with other funds from TD Bank Account No. xxx1862 to Wells Fargo Bank Account xxx1321, which is held in the name of Vu X. Huynh & Kimberly A. Huynh.

32

85.     Kimberly Huynh and Vu Huynh had a Wells Fargo Bank mortgage in the amount of $407,500 filed against ███████████, Mt. Laurel, New Jersey.

86.     During the period from September 2016 through November 2018, Kimberly Huynh transferred the illegal proceeds commingled with other funds from Wells Fargo Bank Account xxx1321 to pay for the Wells Fargo mortgage filed against ███████████, Mt. Laurel, New Jersey.

87.     Larchmont Pharmacy and Kimberly Huynh's commingling of the illegal prescription proceeds with other funds into TD Bank Account xxx1854, then transferring of the commingled funds to and between other TD Bank accounts, and then further transferring of the commingled funds to and between the Wells Fargo accounts, was conducted knowing that the transactions concealed the source, nature and location of the illegal proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### III.  Upon a DEA inspection in November 2018, Huynh makes false statements to investigators about her handling of controlled substance prescriptions.

88.     The DEA conducted an inspection of Larchmont Pharmacy in November 2018 and spoke extensively with Kimberly Huynh.

89.     During the inspection, Kimberly Huynh falsely claimed that she verified the first prescription from customers by calling the prescriber. As discussed above, the prescribers for the forged prescriptions confirmed that did not happen.

90.     Kimberly Huynh also claimed that she was flexible on how she charges customers for their prescriptions. She stated that, if a patient is willing to pay cash, she inputs a number for that prescription. She stated that she did not charge too little, or there would be patients out the door, and did not charge too much, or the patients would not come back. A comparison of the forged prescriptions from the DTO with prescriptions for other patients showed that Kimberly

Huynh would charge the customer for the forged prescriptions multiple times more what she charged for a regular prescription, even for the same drug, revealing that she knew which prescriptions were forged and charged more money for dispensing controlled substances with a forged prescription.

91.     Kimberly Huynh also admitted to DEA investigators that one of the members of the Philadelphia DTO would drop off multiple prescriptions for patients who were supposedly family and friends. Huynh stated that, if the prescriptions were too early, the DTO members would drop off the prescriptions and cash with Huynh. Huynh stated that she filled those prescriptions at a later date and would create a false signature for the DTO member to mark that they received the prescriptions before the real pickup. The DTO member would then arrive a day or two later to pick up the prescriptions. DEA investigators subsequently verified by surveillance camera that Kimberly Huynh would falsify the pickup signature on behalf of the DTO member before they picked up the pills.

92.     When asked why she was dispensing and filling these prescriptions, Kimberly Huynh stated she was afraid she would lose the DTO member and his friends as customers. When an investigator commented that Kimberly Huynh would lose money, she remarked that it was good money. DEA investigators subsequently verified by surveillance camera that Kimberly Huynh, on at least one occasion, received a wad of cash from a DTO member picking up the prescriptions and, rather than place the money in the register, walked the wad of cash to the back of the store.

93.     Several members of the DTO have pled guilty to federal criminal charges and admitted that they, in the Eastern District of Pennsylvania, knowingly and intentionally possessed with intent to distribute, and aided and abetted the possession with the intent to

distribute, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, by presenting the false and fraudulent prescriptions outlined above, in violation of 21 U.S.C. § 841(a)(1), (b)(1), and 18 U.S.C. § 2.

94.     Investigators obtained the text messages between one of the DTO members and defendant Kimberly Huynh. Those messages reveal that defendant Kimberly Huynh knew that the DTO members were not presenting the prescriptions for a legitimate medical purpose, as required, but were instead using the prescriptions to further their illegal business activity. In addition, despite informing DEA investigators that she was cooperating with their ongoing covert investigation of the DTO, the text messages reveal that she instead warned this DTO member of the DEA's investigation.

95.     For example, on December 1, 2018, in the midst of the DEA's investigation, DTO member L.D. sent defendant Kimberly Huynh a text message: "Good morning Kim this is [L.D.] how is your morning so far kim im texting to say you know all you have done i really appreciate it if i have to stop doing all my family then fine but i really need to do me my mom and just a few more for my job PLEASE THATS IT I REALLY REALLY NEED THIS JOB I WILL HAVE NOTHING N IM BACK TO THE STREETS LOOKING AGAIN THEN I CANT DO FOR MY KIDS IM SITTING HERE IM IN ATLANTIC CITY WITH MY WIFE STRESSING DONT KNOW WHAT IM GOING TO DO N SHE JUST ASKING WHATS WRONG ITS NOWHERE FOR ME TO GO OUT HERE WHERE I LIVE SO KIM IF YOU FIND IN YOUR HEART TO HELP ME I WILL REALLY APPRECIATE IT YOU KNPW IM A GREAT PERSON THAT JUST TRYING TO MAKE IT AND STAY A GOOD MAN THATS ALL." DTO member L.D. followed up that same day: "Hey Kim how was your day i hope great this

[L.D.] did you get my text?" Defendant Kimberly Huynh responded: "Good morning! Yes, I did."

96.     DTO member L.D. replied to defendant Kimberly Huynh by sending her the following text message and revealed that defendant Kimberly Huynh had warned DTO member L.D. of the DEA's ongoing covert investigation of the DTO: "Good morning kim kim im still out ATLANTIC CITY TRYING TO HAVE FUN BUT THINKING ABOUT IF IM STILL GOING TO BE ABLE TO PROVIDE FOR MY FAMILY OR NOT WITH MY JOB IM STRESSTING HARD BUT KIM I texting to say i know your waiting for them people to do their annual report and im telling my family that but you know they need their meds and i know you mite not be able to do everyone but for those that you cant they just going to have to find someone else but i really need to do some of them cause you know I work for them and i really have to pay bills some i need some of them to keep my job i can come tomorrow after 3pm and whoever you let me do we will keep it rite there im really trying to be the man I told my wife n kids i will be when you get this pleasd text back thank you kim ❤."

97.     Defendant Kimberly Huynh responded: "Hi..you know I would like to help you but I can't do anything until they clear me. They have to do their audit and let me know. I don't know what they are looking for but they will come tomorrow to let me know."

## BASIS FOR FORFEITURE

98.     The defendant $385,000 is subject to forfeiture as a substitute res for ████ ███ Mount Laurel, New Jersey ("Subject Property"), which is subject to forfeiture as follows:

        a)     The Subject Property is property involved in money laundering and property traceable to property involved in money laundering, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property, real or personal,

36

involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, and any property traceable to such property.

b)      The Subject Property is property traceable to proceeds of health care fraud, in violation of 18 U.S.C. § 1347, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), which includes a violation of 18 U.S.C. § 1347.

c)      The Subject Property is property traceable to proceeds of the felonious sale of controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), which includes acts that are offenses listed under 18 U.S.C. § 1961(1), which includes felonious sales of controlled substances.

d)      The Subject Property is property traceable to proceeds of illegal dispensing and distribution of controlled substances, subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), which provides for the forfeiture of all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of the Controlled Substances Act, including 21 U.S.C. § 841, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act.

**COUNTS 1-715:**
**Unlawful Dispensing of Controlled Substances:**
**21 U.S.C. §§ 842(a)(1), 829**

99.     The United States realleges the above paragraphs as if fully set forth herein.

100.    Defendants Larchmont Pharmacy and Kimberly Huynh are subject to the requirements of Part C of the CSA, 21 U.S.C. § 822.

101.    As outlined above, Larchmont Pharmacy and Kimberly Huynh illegally dispensed controlled substances without a valid and effective prescription, in violation of 21 U.S.C. § 829, in that defendants dispensed the controlled substances outlined above based upon forged prescriptions that were not valid or effective for purposes of § 829 for the following prescriptions:

|  | *Rx* | *Qty* | *$* |
|---|---|---|---|
| Oxycodone | 552 | 66,210 | $249,518.11 |
| Oxycodone-Acetaminophen | 27 | 3,240 | $8,210.32 |
| Alprazolam | 136 | 16,320 | $15,630.87 |
| *Total* | 715 | 85,770 | $273,359.30 |

102.    All of the prescriptions presented many red flags, and the defendants knew or had reason to know the prescriptions were forged. Nonetheless, defendants ignored the red flags and violated their corresponding responsibility by illegally dispensing the controlled substances, even when they knew or had reason to know that the prescriptions were illegitimate, were not valid, and were not effective for purposes of 21 U.S.C. § 829.

103.    By dispensing controlled substances 715 times in violation of 21 U.S.C. § 829, defendants Larchmont Pharmacy and Kimberly Huynh violated 21 U.S.C. § 842(a)(1) on at least 715 occasions.

104.    As a result of the violations set forth above, defendants Larchmont Pharmacy and Kimberly Huynh are subject to the relief set forth in the CSA.

**COUNT 716:**
**Claim for Forfeiture:**
**21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C)**

105.     The United States realleges the above paragraphs as if fully set forth herein.

106.     By reason of the foregoing facts, there is reason to believe that the Subject
Property constitutes money or other things of value, furnished or intended to be furnished in
exchange for a controlled substance, proceeds traceable to such an exchange, or money used and
intended to be used to facilitate a violation of the Controlled Substance Act, 21 U.S.C. § 841;
property, real or personal, constituting or derived from proceeds traceable to health care fraud, in
violation of 18 U.S.C. § 1347, and illegal dispensing and distribution of controlled substances, in
violation of 21 U.S.C. § 841; and property, real or personal, involved in transactions in violation
of 18 U.S.C. § 1956, and property traceable thereto.  Therefore, the defendant $385,000, as a
substitute res for the Subject Property, is subject to forfeiture to the United States pursuant to 18
U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), and 21 U.S.C. § 881(a)(6).

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America demands judgment against defendants
Larchmont Pharmacy and Kimberly Huynh as follows:

1.     For violations of 21 U.S.C. § 842(a)(1), civil penalties of up to $67,627 per
violation occurring after November 2, 2015, 28 C.F.R. § 85.5;

2.     Injunctive relief, pursuant to 21 U.S.C. §§ 843(f), 882, permanently enjoining
defendants from distributing or dispensing controlled substances;

3.     The defendant $385,000 be proceeded against according to the law and rules of
this Court and that due notice be given to all potential claimants to appear and show cause why
forfeiture should not be decreed;

4.     The Court, for the reasons set forth above, adjudge and decree that the defendant $385,000 be forfeited to the United States of America, and disposed of in accordance with the existing laws, together with costs, and for such other relief this Court deems proper and just; and

5.     Post-judgment interest, costs, and such other and further relief as the Court deems just and equitable.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division

SARAH L. GRIEB
Assistant United States Attorney
Chief, Asset Recovery and Financial Litigation

ANTHONY D. SCICCHITANO
Assistant United States Attorney
PA 208607
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8380
anthony.scicchitano@usdoj.gov

*Attorneys for the*
*United States of America*

Dated: October 8, 2020

**VERIFICATION**

I, Sherilyn R. Gillespie, being of legal age, verify and, pursuant to 28 U.S.C. § 1746(2), declare and state as follows:

I am a task force officer with the Drug Enforcement Administration assigned to investigate this matter.

I have reviewed the foregoing Complaint and know the contents thereof, and that the matters contained in the Complaint are true to my knowledge.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I hereby verify and declare under penalty of perjury that the forgoing is true and correct.

Sherilyn R. Gillespie
Task Force Officer, DEA

Dated: October 8, 2020